**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA for the use of TRINITY INDUSTRIAL SERVICES, LLC,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:12-CV-203(MTT)** |
| **FEDERAL INSURANCE COMPANY, and BENHAM CONSTRUCTORS, LLC,** | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on the Parties' cross-motions for summary judgment. (Docs. 28, 29). The principal issue raised by Trinity Industrial Services, LLC's motion is whether the Parties' contract unambiguously stated the price for the removal of soil from a project site. In its motion, Benham Constructors, LLC contends that Trinity's claims for attorney's fees and prejudgment interest should be dismissed. For the reasons discussed below, both motions are **DENIED**.

## I. FACTUAL BACKGROUND

This is an action brought pursuant to the Miller Act, 40 U.S.C. § 3131, *et seq*. Benham is the United States Army Corps of Engineers – Savannah District's design-build contractor on the Advanced Metal Plating Facility project at Robins Air Force Base in Houston County, Georgia (the "Project"). (Doc. 28-2 at ¶ 3). The Miller Act requires any general contractor awarded a government contract greater than $100,000 for the

construction, alteration, or repair of any public building or public work to secure two bonds: (1) a performance bond to protect the government and (2) a payment bond "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract." 40 U.S.C. § 3131(b). Federal Insurance Company ("FIC") acted as the payment bond surety for Benham on the Project. (Doc. 28-2 at ¶ 5).

In February 2010, Benham began communicating with Trinity regarding the possibility of subcontracting work on the Project site.[1] (Doc. 40 at ¶ 1). At the time, Benham was aware of a sizeable "bid bust" (i.e., monetary loss) on the Project resulting from errors in the bid estimate, and Benham recognized that soil excavation work was "the major problem." (Docs. 33-1 at 2; 40 at ¶ 1). The error regarding the soil excavation costs occurred because Benham assumed the soil would be reused on site, but, as it turned out, Benham was required to haul the soil to a landfill until testing of its contamination levels could be completed. (Docs. 29-3 at 165:5-169:9; 40 at ¶ 2). Benham began to explore ways to minimize the soil disposal costs, including the possibility of paying tipping fees[2] directly to the landfill to avoid paying a percentage markup to a subcontractor. (Doc. 40 at ¶ 4).

Ultimately, Benham chose to use a subcontractor and entered into a utilities, earthwork, and shoring subcontract with Trinity, which is the contract at issue in this action (the "Subcontract"),[3] on October 27, 2010. (Doc. 29-2 at ¶ 1). Trinity agreed to

---

[1] Because FIC has no involvement in this case other than in its role as surety, Benham and Trinity are referred to throughout this Order as the "Parties."

[2] A tipping fee is a per ton charge assessed by landfills for the disposal of waste, including soil. (Doc. 29-2 at ¶ 9).

[3] The Parties had another subcontract which came to involve soil removal, but it is not necessary to discuss that contract to resolve Trinity's motion.

furnish certain labor, material, equipment, and supplies for the Project, including the hauling and disposal of non-hazardous soil from the Project site. (Docs. 28-2 at ¶ 4; 29-2 at ¶ 5). The Subcontract did not explicitly specify which landfill Trinity would use to dispose of non-hazardous soil. (Doc. 29-2 at ¶ 10). At the time of its execution, however, the Parties understood the Houston County landfill was the only landfill approved by personnel at Robins Air Force Base and the Army Corp of Engineers for disposal of soil from the Project site. (Doc. 29-2 at ¶ 11).

Trinity contends the Subcontract specified a unit rate of $40.85 per ton for soil disposal, which is a mark-up of the tipping fee at the Houston County landfill. (Doc. 29-2 at ¶¶ 7, 14). The Subcontract does not disclose the Houston County tipping fee, but the Parties were aware that the Houston County tipping fee was $35.50 per ton, and Trinity used a 15% markup to yield the $40.85 unit rate. (Doc. 29-2 at ¶ 13). Prior to executing the Subcontract, the Parties discussed the possibility of getting another landfill approved and ultimately settled on the Swift Creek landfill because it had lower tipping fees and could handle more volume than Houston County. (Doc. 40 at ¶¶ 5-6).

At some point during the negotiations, Benham sent Trinity drafts of schedules for the Subcontract.[4] Under the "Hauling and Disposal" section of Schedule A, which defined the "Scope of Work," Paragraph I stated, "Landfill disposal (Tipping) fees for the soil are 'not to exceed' $40.85/ton and cost will be finalized upon soil profile and landfill approval." (Doc. 40-19 at 2).

On September 2, 2010, Barry Roberts, Trinity's representative, circulated a chart of values relating to the proposed soil excavation and other work. (Doc. 39-1). Under

[4] The drafts are dated June 14, 2010 but reference a drawing dated August 11, 2010. (Doc. 40-19 at 2). Thus, Benham believes the drafts were sent sometime in late August or September 2010.

the heading "Estimated Additional Cost Depending on Soils Characterization," the contaminated soil disposal rate is listed as $40.85 per ton for the Houston County landfill "per approved plan." (Doc. 39-1 at 3). Roberts testified, in reference to this document, the estimated price for soil disposal was based on using the Houston County landfill. (Doc. 34-3 at 155:17-24). On September 3, Roberts sent an email to the recipients of the chart elaborating on the estimated expense for soil disposal. (Doc. 39-2 at 1). Roberts stated that the minimum tipping fee would be in the $35 per ton range, and Trinity would "go to work on a better number" once it had "test results and volume commitments" but without those specifics, "[Benham had] the number." (Doc. 39-2 at 1). Roberts further testified it was Benham and Trinity's "intention from the outset" to "share the number" if they "were able to get a better number" on soil disposal, but he believed Trinity was entitled to charge the full unit rate in the contract regardless of the actual tipping fee or the landfill used. (Doc. 34-3 at 146:4-8; 156:5-13).

On October 7, Roberts sent an email to Brian Kelly and Nathan Lloyd, Benham's project manager on the Project and senior procurement specialist, respectively, regarding unresolved issues in the contract negotiations, including the matter of soil disposal. (Doc. 40-14). In reference to the tipping fee, Roberts stated, "Our best quoted price is the $40.85 number per ton for contaminated soil at Houston County, but we are not aware as to whether the profiles have been accepted. I understand that [Benham's site manager, Gary Weiler] is working on this. We may have a better number, but the site is 10 miles farther and would require more trucking cost. Gary sent me the first results for trench and we have sent it on to the alternate site for review.

Once we have a firm number, we will provide a potential alternate. …"[5] (Doc. 40-14 at 2). The Parties actively sought approval from the Project's appropriate personnel to dispose soil at Swift Creek. (Doc. 29-2 at ¶ 12). On October 8, Roberts sent Weiler the permit for Swift Creek to have it approved as an alternative landfill. (Doc. 40-15).

On October 13, Tom Frost, Trinity's managing member, sent an email to several individuals at Benham asking, "How are we looking on the waste profiles being submitted and approved for Swift Creek or Houston County? To our knowledge nothing is approved all the way through, so starting on Monday may not be an option until we have the approval to take dirt off site and dispose of it." (Doc. 40-16 at 1). The email went on to state, "The [n]umber for [d]isposal is the same until we have confirmation of Swift Creek's approval, then we will probably adjust that number, but to start we need to stick with the $40.85." (Doc. 40-16 at 1). On the same day, Weiler sent Benham's request and supporting documentation to the Corps of Engineers for approval of Swift Creek as an alternate landfill. (Doc. 40 at ¶ 15).

Swift Creek was eventually approved after execution of the Subcontract, and Trinity began hauling non-hazardous soil to the new landfill. (Doc. 29-2 at ¶ 12). In November 2010, the Parties began to discuss how and when the unit rate for soil disposal would be decreased. (Doc. 34-1 at ¶¶ 5-6). The Parties' representatives continued to discuss the possibility of reducing the soil disposal unit rate through May 2011 but did not reach an agreement. (Doc. 34-1 at ¶¶ 11-22). Benham withheld payment from Trinity's final three pay applications because Trinity continued to charge

[5] Roberts acknowledged in his deposition the "site" he referred to was the Swift Creek landfill. (Doc. 34-3 at 163:8-14).

for soil disposal at $40.85 per ton. (Doc. 34-1 at ¶ 23). On August 5, 2011, Benham terminated the Subcontract. (Doc. 34-1 at ¶ 24).

Trinity has now moved for summary judgment on its breach of contract and Miller Act claims, while Benham and FIC have moved for summary judgment on Trinity's requests for attorney's fees and prejudgment interest. Although Benham has asserted counterclaims for breach of contract, breach of fiduciary duty, and negligence, none of the Parties has moved on those claims.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Info. Sys. & Networks Corp.*, 281 F.3d at 1224. The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary

judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id*.

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 940, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may

show … that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

**B. Relevant Provisions from the Subcontract**

The final Subcontract twice mentions the unit rate for soil disposal. Schedule A, titled "Scope of Work," states the details of the work to be performed and, for work subject to a unit rate, the amount of the unit rate. The unit rate for soil disposal is found under the "Hauling and Disposal" section of Schedule A, which states, "[Trinity] shall Haul Excavated Non-Hazardous Soils as outlined below … [b]ased upon current landfill disposal (Tipping) fees for the non-hazardous soil is a 'not to exceed' $40.85/ton." (Doc. 28-3 at 16).

Paragraph 2 addresses the price to be paid to Trinity:

> Price – *Subject to all of the other provisions of the Subcontract*, [Benham] shall pay to [Trinity], for the full performance of the Work, the Subcontract Price set forth above (the "Price"); however, if all or a portion of the Work is to be performed on a reimbursable cost or "time and materials" basis, and unless otherwise specified, the Subcontract Price shall be the Guaranteed Maximum Subcontract Price payable for Work performed. *If all or a portion of the Work is to be performed on a unit price basis, then the Price set forth shall be deemed an estimated total price for the Work and the actual price shall be computed in accordance with the lump sum price(s), if any, and the unit prices set forth in Schedule C, based on actual quantities determined in accordance with the Contract Documents. Unit prices shall not be subject to adjustment because of any variation in actual quantities from those specified in this Subcontract or the Contract Documents.* Except to the extent allowed and actually paid to [Benham] under the Contract, the Price shall not be increased or decreased on account of any changes in costs of any materials or labor, or on account of any changes in governmental statutes or regulations, including but not limited to those relating to the payment of taxes.[6]

(Doc. 28-3 at 3) (emphasis added).

The unit rates are found in a section of Schedule C titled "Schedule of Values Breakdown." (Doc. 28-3 at 22). It lists the various unit rates and values and states that this "information shall be utilized for the monthly tracking of progress for billing purposes." (Doc. 28-3 at 22). With regard to unit rates, the schedule is largely consistent with the unit rates found in Schedule A. The wording for soil disposal, however, is different than the wording in Schedule A. The schedule of values breakdown section of Schedule C states "Soil Disposal (Tipping fee) $40.85/ton." (Doc.

[6] The Subcontract Price set forth above is $775,605.45. (Doc. 28-3 at 2). The Contract referenced is the general contract between Benham and the Corps of Engineers.

28-3 at 22). The dollar value for the soil disposal unit rate is stated as "TBD," or to be determined. (Doc. 28-3 at 22).

The Subcontract also contains a merger or integration clause. Paragraph 30(a) states, "As regards the subject matter hereof, this writing, including documents attached hereto and/or incorporated herein by reference, constitute the entire agreement between the parties and supersedes all prior negotiations, representations or agreements, written or oral." (Doc. 28-3 at 12).

The Subcontract's choice of law provision states, "All matters relating to the validity, performance or interpretation of this Subcontract and the remedies or procedures provided herein shall be governed by the law of the jurisdiction required in the Contract, or if none is stated or required, the law of the State of Oklahoma." (Doc. 28-3 at 13). The Contract states, "United States law will apply to resolve any claim of breach of contract." (Doc. 28-4 at 166). However, neither Benham nor Trinity discusses whether the choice of law provision in the Contract affects the choice of law governing the Subcontract. Instead, they assume the Subcontract is governed by Oklahoma law. Because the Contract's choice of law provision does not have any apparent impact on Trinity's state law claims, the Court will analyze those claims pursuant to Oklahoma law.

**C. Contract Interpretation Under Oklahoma Law**

"[T]he cardinal rule in contract interpretation is to determine and give effect to the intent of the parties." *Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095, 1101 (10th Cir. 2007) (alteration in original) (quoting *In re Kaufman*, 2001 OK 88, ¶ 13, 37 P.3d 845, 853 (2001)). The intent at issue is the parties' mutual intent at the time

they entered into the contract. OKLA. STAT. ANN. tit. 15, § 152. If possible, the intent of the parties should be ascertained from the contract alone. *Id.* § 155. However, if the contract is determined to be ambiguous, then extrinsic evidence becomes admissible to resolve the ambiguity and clarify the parties' intent. *Otis Elevator Co.*, 483 F.3d at 1102 (citation omitted).

Ambiguity in contracts may be facial or latent. A contract is facially "'ambiguous if it is reasonably susceptible to at least two different constructions' such that 'reasonably intelligent men[ ] on reading the contract would honestly differ as to its meaning.'" *Id*. (quoting *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 14 n.19, 63 P.3d 541, 545-46 (2003)). The Court should look at the language of the entire agreement to determine whether it is ambiguous and construe the contract in a manner that gives effect to all of its provisions. *Eureka Water Co. v. Nestle Waters N. Am., Inc.*, 690 F.3d 1139, 1149 (10th Cir. 2012) (quoting *Pitco Prod. Co.*, 2003 OK at ¶ 14, 63 P.3d at 545-56). Extrinsic evidence may be used "to show the situation of the parties, circumstances surrounding the execution of the contract and the negotiations preceding and leading up to the making of the agreement in order to arrive at the contract's true intent and meaning." *Pub. Serv. Co. of Okla. V. Home Builders Ass'n of Realtors, Inc.*, 1976 OK 120, 554 P.2d 1181, 1185 (1976). If there is ambiguity or uncertainty as to the meaning of a term, the Court may look to the usage and custom in a particular trade, profession, or occupation and whether the parties entered into the contract with knowledge of and in respect to such usage to explain the term's meaning. *Id*.

"A 'latent ambiguity' is one not evident from the face of the instrument alone but becomes apparent when applying the instrument to the facts as they exist." *Id*. at 1152

(quoting *Ryan v. Ryan*, 2003 OK CIV APP 86, ¶ 14, 78 P.3d 961, 964 (2003)). "It arises when language is clear and intelligible and suggests but a single meaning, but some extrinsic fact or some extraneous evidence creates a necessity for interpretation or a choice between two or more possible meanings." *Id*. (quoting *Ryan*, 2003 OK CIV APP at ¶ 14, 78 P.3d at 965).

The determination of whether a contract is ambiguous and the interpretation of an unambiguous contract are questions of law for the Court. *Id*. (citations omitted). However, the "[i]nterpretation of an ambiguous contract is a mixed question of law and fact and should be decided by the jury." *Id*. (citing *Fowler v. Lincoln Cnty. Conservation Dist.*, 2000 OK 96, ¶ 15, 15 P.3d 502, 507 (2000)).

**D. Breach of Contract Claim**

To prevail on a breach of contract claim under Oklahoma law, Trinity must prove: (1) the formation of a contract; (2) Trinity's performance; (3) Benham's nonperformance or breach; and (4) actual damages. *Dealer Express Mktg., L.L.C. v. Autodealer Express, L.L.C.*, 2010 WL 1253582, at *3 (W.D. Okla.) (citing *Oltman Homes, Inc. v. Mirkes*, 2008 OK CIV APP 64, ¶ 8, 190 P.3d 1182, 1185 (2008)). Neither Trinity nor Benham contests that a valid contract was formed or that Benham failed to pay Trinity for several pay applications prior to the termination of the contract.

The crux of the dispute between the Parties is the interpretation of the unit rate for non-hazardous soil disposal and whether that unit rate could be altered based on a change of landfill. Trinity contends the unit rate is unambiguously $40.85 per ton regardless of what landfill was used for soil disposal. Benham argues that the language of Schedule A qualifies Trinity's right to charge Benham the maximum unit rate for soil

disposal.[7] Prior to executing the Subcontract, Benham contends, the Parties discussed and anticipated switching to a less costly landfill, and because they could not get approval for the new landfill prior to execution, they used the "not to exceed" language to reflect their intent that they would decrease the unit rate in the future.

The Court concludes that the contract is ambiguous. Schedule C, which obviously derives its values from Schedule A, does not include the qualifying language for the soil disposal unit rate in its "Schedule of Values Breakdown." Rather, Schedule C merely lists the "rate" for "Soil Disposal (Tipping fee)" as $40.85 per ton and the "value" as "$TBD." (Doc. 28-3 at 22). Pretermitting the question of whether Schedule C unambiguously states a unit rate of $40.85 per ton for soil disposal,[8] it conflicts with Schedule A. While Schedule C does not provide any mechanism for altering the $40.85 per ton value and suggests that value is a set rate, Schedule A lists that value as "a 'not to exceed'" figure[9] and appears to contemplate a change in that rate based on a change in the tipping fee. However, the Subcontract provides no basis for recalculating the unit rate if there is a change in the tipping fee. Unlike the soil disposal unit rate, the Parties

---

[7] Trinity argues that Benham has waived any argument that the soil disposal unit rate could be adjusted because it voluntarily paid this unit rate over numerous pay applications. Notwithstanding the fact that the Subcontract contains a non-waiver clause, the Court cannot conclude from the evidence before it that Benham voluntarily paid "with full knowledge of the facts" under which the money was demanded. *City Nat'l Bank & Trust Co. v. Harvey*, 250 Okla. 428, 429, 238 P.2d 360, 361 (1951).

[8] Schedule C is arguably internally ambiguous. It sets forth a "tipping fee," even though the intent of the contract was not to charge a tipping fee but rather to charge a unit rate. A tipping fee is a rate charged by the landfill. Perhaps more importantly, Schedule C states that the unit rates and other values in Schedule C are to be used "for the monthly tracking of progress for billing purposes." (Doc. 28-3 at 22). Nothing in the record explains the meaning of this language.

[9] Neither Benham nor Trinity explains the precise meaning of "a 'not to exceed'" as used in Schedule A. Trinity argues that the two Schedules may be read together consistently because either provision allows Trinity to charge the maximum unit rate of $40.85 per ton. Benham more correctly argues that reading the Subcontract to allow Trinity to bill a flat unit rate of $40.85 per ton regardless of the current landfill renders the phrase "not to exceed" meaningless.

did not use any qualifying language for the other unit rates appearing in Schedules A and C, which further suggests the language "[b]ased upon current landfill disposal (Tipping) fees" and "a 'not to exceed'" are not superfluous. Because the two provisions cannot be read consistently together and are subject to differing interpretations, the soil disposal price term is ambiguous.[10] Accordingly, extrinsic evidence may be considered to determine the Parties' intent on this issue.

The extrinsic evidence in this case consists primarily of the Parties' pre-contract negotiations and the usage of the term "not to exceed" in the Parties' trade. First, the Parties' pre-contract negotiations are somewhat conflicting. The Parties clearly intended to switch from Houston County to Swift Creek upon approval by the Corps of Engineers, and neither Benham nor Trinity disputes this. However, the reason why is less clear. Benham has presented evidence that the Parties were looking for a "cheaper" alternative to Houston County and a "better" soil disposal unit rate. Trinity has presented evidence, on the other hand, that the primary motivation behind switching to Swift Creek was that Houston County could not handle the volume of soil that Benham needed to quickly remove from the Project site. There has also been suggestion by Trinity that Benham was not very concerned with the unit rate prior to executing the Subcontract because it believed the soil would be approved to use on site as backfill.

There were also significant pre-contract discussions regarding the possibility of lowering the unit rate upon approval of Swift Creek. Although Trinity now contends the

[10] Trinity also argues that any ambiguity in the Subcontract should be construed against Benham as the drafter. Benham, however, has argued and presented evidence that both Parties participated in the drafting of this contract, particularly concerning this price term. Thus, it is not clear that this rule of construction aides in interpreting the Subcontract.

Subcontract unambiguously entitles it to charge $40.85 per ton regardless of what landfill is used or the actual tipping fee, Roberts testified it was the Parties' "intention from the outset" to "share the number" if they could get a lower tipping fee by changing landfills. However, there is also conflicting evidence over whether Trinity was being charged a lower fee immediately upon switching to Swift Creek or whether it would receive a reimbursement of the paid tipping fees upon reaching a certain volume of soil.

Second, Trinity argues there is a specialized meaning for "not to exceed" price terms in government contracts. Trinity contends these "price terms indicate that a cost in excess of the specified maximum price will not provide a basis for a party to seek [] an equitable adjustment" should changes to costs result from changed conditions. (Doc. 29-1 at 9). Benham, however, contends that the "not to exceed" price term merely sets a ceiling but does not set a floor so that the price term could be lower based on actual costs.

Thus, the conflicting extrinsic evidence presented by the Parties does not allow the Court to ascertain their intent. Given that the Subcontract is ambiguous as to the soil disposal unit rate and how the Parties may adjust that rate based on the costs of the "current landfill," there are genuine issues of material fact that the Court cannot resolve, and the interpretation of an ambiguous contract is a determination for a jury pursuant to Oklahoma law.

Further, even if the Subcontract were not ambiguous and the Court could interpret the price term in favor of one of the Parties, the Court would still not be able to resolve Trinity's breach of contract claim. Although not raised in the Parties' briefs or at oral argument, Benham asserted in its answer that other provisions of the Subcontract

giving it the right to withhold payment under certain conditions and requiring Trinity to continue performance despite nonpayment are at issue. Accordingly, for all of the reasons discussed, summary judgment as to Trinity's breach of contract claim is **DENIED**.

**E. Miller Act Claim**

The Miller Act protects subcontractors on federal projects by requiring contractors to post a bond to ensure payment to their subcontractors. 40 U.S.C. § 3133; *see also U.S. for Use and Benefit of Krupp Steel Prods., Inc. v. Aetna Ins. Co.*, 831 F.2d 978, 980 (11th Cir. 1987). To establish a prima facie case under the Miller Act, a plaintiff must show: (1) it supplied labor and materials for carrying out the work provided for in the contract at issue; (2) it has not been paid; (3) it had a good faith belief that the materials were for the specified work; and (4) jurisdictional requisites are met. *U.S. ex rel. James B. Donaghey, Inc. v. Dick Corp.*, 2010 WL 4666747, at *3 (N.D. Fla.) (citing *Krupp Steel*, 831 F.2d at 980).

Although Trinity has moved for summary judgment on its Miller Act claim, it has not established that it has met the elements of this claim. Rather, Trinity seems to assume the Court's interpretation of the soil disposal price term is the only issue relevant to resolving this claim. Because the Court cannot resolve that issue and Trinity does not otherwise establish it has satisfied the elements of its Miller Act claim, summary judgment on this claim is **DENIED**.

**F. Attorney's Fees and Prejudgment Interest**

Benham contends attorney's fees are not available under Miller Act claims. Benham also argues that Trinity has insufficiently pled a basis for attorney's fees under

state law because the Subcontract is governed by Oklahoma law, and Trinity requested attorney's fees pursuant to a Georgia statute. Trinity responds that the Miller Act allows recovery of attorney's fees for bad faith and vexatious, wanton, and oppressive conduct, which it contends Benham has engaged in. Benham also contends Trinity is not entitled to prejudgment interest because the Georgia statutes Trinity has based this claim on are inapplicable.

Trinity contends it was not required to set forth the specific statutes on which its claims for attorney's fees and prejudgment interest are based and that it is entitled to attorney's fees and prejudgment interest under analogous Oklahoma statutes. Although the Miller Act does not provide for an award of attorney's fees, it does not preclude a successful party from recovering attorney's fees if there is evidence of bad faith. *F.D. Rich Co. v. U.S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 126, 129 (1974). Further, a plaintiff may pursue attorney's fees under state law when he also has state law causes of action in addition to a Miller Act claim, although an award of attorney's fees may be made only against the contractor and not against the surety. *U.S. ex rel. Cal's A/C & Elec. v. Famous Constr. Corp.*, 220 F.3d 326, 327-29 (5th Cir. 2000). Given the Court's finding that the Subcontract is ambiguous and that the soil disposal price term is subject to competing interpretations, it is doubtful whether Trinity could establish that Benham acted in bad faith, but that issue is not raised by Benham's motion.

Trinity has also asserted a state law breach of contract claim, and Oklahoma law allows a prevailing party to recover reasonable attorney's fees "[i]n any civil action to recover for labor or services rendered, or on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or

sale of goods, wares, or merchandise." OKLA. STAT. ANN. tit. 12, § 936.A. While the Court is mindful that Trinity did not plead the correct statutes in its complaint and that Benham put Trinity on notice of this insufficiency, it is worth noting that Benham also requested attorney's fees and prejudgment interest on its counterclaims without identifying a legal basis for either. Dismissal is not warranted simply because Trinity's complaint cites the wrong statutes.

In its reply brief, Benham also argues Trinity cannot recover prejudgment interest because an award of prejudgment interest under either the Miller Act or breach of contract claims is governed by the applicable state law, and Trinity's damages are not capable of being made certain as required by Oklahoma law. *See* OKLA. STAT. ANN. tit. 23, § 6 ("Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . …").

Given the Court's determination that the soil disposal price term is ambiguous and is an issue appropriate for resolution by a jury, there may be a valid argument that prejudgment interest is not recoverable because damages are not capable of being ascertained. *See Transpower Constructors, v. Grand River Dam Auth.*, 905 F.2d 1413, 1422 (10th Cir. 1990) (citations omitted) ("Damages are not certain where their calculation is left to the best judgment of the fact-finder."). However, this issue was raised for the first time in Benham's reply brief rather than in its motion, and Trinity has not had an opportunity to respond. The Court cannot make the determination of whether Trinity's damages are calculable prior to judgment until the issue has been

properly briefed by the Parties. Accordingly, Benham's motion for summary judgment must be **DENIED**.

## III. CONCLUSION

The Parties' motions for summary judgment are **DENIED**.

**SO ORDERED,** this the 27th day of February, 2014.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT